UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JFB HART COATINGS, INC.,           )
                                   )
          Plaintiff,               )
                                   )
     v.                            )     No. 09 C 7466
                                   )
AM GENERAL LLC,                    )     Judge Ruben Castillo
                                   )
          Defendant.               )

## MEMORANDUM OPINION AND ORDER

Presently before the Court are serious allegations that a party to this action has sought to

distort the discovery and trial process through conduct that merits sanctions. AM General LLC

("AM General" or "Defendant") has filed a motion for default judgment against JFB Hart

Coatings, Inc. ("JFB Hart" or "Plaintiff"), asking the Court to dismiss this case with prejudice

because JFB Hart has engaged in misconduct including document fabrication, perjury, and failure

to produce important documents in a timely manner. (R. 40, Def.'s Mot. for Default J. at 6, 11-

13.) Alternatively, AM General seeks entry of an order compelling JFB Hart to produce certain

documents and metadata related to the allegedly fabricated documents. (R. 42, Def.'s Mot. to

Compel.) For the reasons stated below, the Court stays AM General's motion for default

judgment pending an evidentiary hearing, which the Court will hold on March 10, 2011 at 10:00

a.m. The Court also grants AM General's motion to compel.

## BACKGROUND

JFB Hart brought this action for declaratory judgment under 28 U.S.C. § 2201 against

AM General. (R. 20, Am. Compl.) JFB Hart seeks a declaration that it is the sole owner of all

1

rights to certain trade secrets, and a permanent injunction protecting those rights and enjoining AM General from declaring any ownership rights in or using any of the trade secrets. (*Id.* ¶ 49.)

## I.     JFB Hart's Allegations

JFB Hart is a closely-held family company that produces commercial products for various markets, including commercial and institutional floor care, industrial coatings, and specialized manufactured products for health care and educational facilities. (*Id.* ¶ 13.) Using some of its earlier products as a foundation, JFB Hart claims that it "conceived, derived, and developed" formulas and methods for manufacturing specialized castable urethanes known as OCM, BTA, and SAM, and their derivations. (*Id.* ¶ 25.) The castable urethanes can form an extremely strong composite material, which in turn has uses including armor protection and ballistic resistance in vehicle windshields for military transport vehicles, transparent armor, or windows. (*Id.* ¶ 14.)

In seeking a declaratory judgment, JFB Hart claims that the trade secrets at issue include the OCM, BTA, and SAM formulas and manufacturing methods "set forth" in Exhibit A to the amended complaint. (*Id.* ¶ 16.) According to JFB Hart, it has invested significant time, effort, and resources—over a million dollars—to invent, develop, and test the OCM, BTA, and SAM formulas and manufacturing methods. (*Id.* ¶ 18.) JFB Hart also claims that it has taken reasonable efforts to maintain the secrecy and confidentiality of the OCM, BTA, and SAM formulas and manufacturing processes. (*Id.*) Those efforts include: (1) confidentiality and proprietary information agreements with employees and suppliers of materials; (2) controlled handling and limited access by only authorized individuals to the OCM, BTA, and SAM formulas and manufacturing methods; (3) confidentiality agreements with third parties including AM General; (4) restricted access to JFB Hart's facilities; and (5) conspicuously stamping as

confidential the written materials of the OCM, BTA, and SAM formulas and methods. (*Id.* ¶ 19.)

JFB Hart further alleges that the OCM, BTA, and SAM formulas and manufacturing methods are

sufficiently secret to derive significant economic value because they are not generally known to

or readily ascertainable by proper means, and cannot be determined or reverse engineered from

analysis of the resultant product. (*Id.* ¶ 20.) Finally, JFB Hart maintains that AM General claims

to have an ownership interest in the OCM, BTA, and SAM formulas and manufacturing

methods, and that those ownership claims detrimentally affect JFB Hart's ability to market,

license, and sell its rights to and products made from the OCM, BTA, and SAM formulas and

manufacturing methods. (*Id.* ¶¶ 46-47.)

### 1. JFB Hart's Relationship with William Brown and Alpha Material Technology, Inc.

Beginning in 2004, JFB Hart entered a business relationship with William F. Brown

("Brown"), an employee of Alpha Material Technology ("Alpha Material" or "AMT") who is

now deceased. (*Id.* ¶¶ 22-23.) JFB Hart claims that it had a confidential relationship with

Brown, and the purpose of that relationship was for Brown to test the paints, coatings, or other

materials developed by JFB Hart, provide feedback to JFB Hart, and find markets and customers

for JFB Hart's products. (*Id.* ¶¶ 23-24.) JFB Hart alleges that Brown tested certain castable

urethane products, and under confidentiality requirements, JFB Hart shared some of the formulas

and manufacturing methods for OCM, BTA, and SAM with Brown. (*Id.* ¶ 26.)

In December 2007, JFB Hart claims it proposed terms of a commission agreement

between JFB Hart and Brown for the sale of products made from the OCM, BTA, and SAM

formulas and manufacturing methods. (*Id.* ¶ 27.) Brown received $40,000 as an advancement

toward his future commissions. (*Id.*) Brown died in March 2009. (*Id.* ¶ 39.)

## 2. AM General's Relationship with JFB Hart, Brown, and Alpha Material

AM General is the maker of the HUMVEE military vehicle. (*Id.* ¶ 29.) AM General sought to improve its optically-clear windshields, and the materials made from the OCM, BTA, and SAM formulas and manufacturing methods satisfied AM General's criteria for improved windshields. (*Id.* ¶ 30.) JFB Hart alleges that under confidentiality agreements and restrictions, JFB Hart on its own or through Brown provided AM General samples of the OCM, BTA, and SAM castable urethane products for AM General to test and analyze for their potential use in the HUMVEE military vehicles. (*Id.*)

In January 2009, AM General expressed an interest in entering into a business relationship with JFB Hart. (*Id.* ¶ 32.) Under the proposed agreement, JFB Hart would be the exclusive supplier of castable urethane products to AM General. (*Id.*) JFB Hart claims that after Brown's death in March 2009, however, instead of entering into the agreement, AM General alleged that it owned the OCM, BTA, and SAM formulas and manufacturing methods. (*Id.*) AM General based this claim on a written agreement AM General had with Alpha Material, dated March 6, 2008, and signed by Brown as president of Alpha Material. (*Id.* ¶ 34.) JFB Hart maintains that neither AM General nor Brown informed JFB Hart of the agreement until March 12, 2009. (*Id.*) JFB Hart also claims that when entering the agreement with Alpha Material, AM General was aware, or should have been aware, that JFB Hart had developed the OCM, BTA, and SAM formulas and manufacturing methods. (*Id.* ¶ 35.) JFB Hart further alleges that AM General entered into the agreement without providing any notice to JFB Hart until a year after the agreement was made, and without seeking an assignment of JFB Hart's rights in and to the OCM, BTA, and SAM formulas and manufacturing methods. (*Id.*)

4

JFB Hart maintains that it never sold, assigned, or licensed to AM General, Brown, or Alpha Material any of its rights in the OCM, BTA, and SAM formulations and manufacturing methods. (*Id.* ¶ 31.) JFB Hart alleges that AM General conceded this in a proposed term sheet for an armor products supply agreement on March 16, 2009. (*Id.* ¶ 37.) JFB Hart further claims that AM General admitted under oath in fraud proceedings against Brown's estate that Brown and Alpha Material never owned the OCM, BTA, and SAM formulas and manufacturing methods prior to entering into the agreement with AM General. (*Id.* ¶ 40.) Thus, JFB Hart contends, Brown could not have assigned rights to AM General. (*Id.*)

## II.  AM General's Defenses

AM General asserts several defenses based on a contradictory view of events leading up to this action.[1]  AM General contends that JFB Hart's action is barred because JFB Hart does not have trade secrets related to any of the formulas, manufacturing methods, or other information identified in Exhibit A to the amended complaint ("Third Defense: No standing/trade secrets"). (R. 30, Answer ¶ 52.) AM General also maintains that JFB Hart's action is barred because AM General purchased the disputed rights from Alpha Material, and did not have notice, actual or constructive, of JFB Hart's claims ("Fourth Defense: *Bona fide* purchaser"). (*Id.* ¶ 53.) AM General specifically points to a written agreement it executed with Brown's company, Alpha Material, around March 6, 2008, after Brown had entered into a written agreement with Alpha Material regarding the assignment of intellectual property rights. (*Id.* ¶ 54.) In these agreements, Brown made several representations and warranties about the invention of "the SAM, the SAM

---

[1]  In addition to the defenses discussed here, AM General also asserts the defenses of lack of subject-matter jurisdiction, failure to state a claim, laches, assignment, and license. (R. 30, Answer ¶¶ 50-51, 62-65.)

Formulas, the OCM and the OCM Formula," the rights to the formulas, the secrecy of the formulas, and the lack of any third-party claims on the formulas. (*Id.*) In reliance on these representations and warranties, AM General entered into an agreement with Alpha Material and paid Alpha Material at least $3.25 million. (*Id.* ¶ 55.)

AM General also claims that JFB Hart waived any alleged rights to the formulas and manufacturing methods for castable urethanes in its dealings with AM General ("Fifth Defense: Waiver"). (*Id.* ¶ 56.) Beginning in at least March 2008 and through April 2009, JFB Hart sold AM General gallons of materials ("Parts A and B") for AM General to make the optically clear armoring material. (*Id.*) AM General contends that JFB Hart provided Brown with Material Safety Data sheets that disclosed certain information regarding the alleged trade secrets in Exhibit A of the complaint. (*Id.* ¶ 57.) Those sheets did not identify JFB Hart, and instead listed Brown or Alpha Material as the manufacturer. (*Id.*) Other documents disclosing information contained in Exhibit A similarly did not identify JFB Hart. (*Id.*)

AM General also claims that the doctrine of estoppel bars JFB Hart's action (Sixth Defense: Estoppel"). (*Id.* ¶ 61.) AM General alleges that it relied upon JFB Hart's acts and omissions to its detriment. (*Id.*) Those acts and omissions included: (1) JFB Hart's shipment of materials to AM General; (2) JFB Hart's agreement to the terms and conditions of the purchase orders; (3) JFB Hart's execution of the Mutual Proprietary Information Agreement; (4) JFB Hart's failure to assert or notify AM General of any purported rights until at least March 2009; (5) JFB Hart's use of the terms "BTA" or "Brown's Transparent Armor"; (6) JFB Hart's labeling of products and documents "AMT" or "AMT, Inc."; and (7) JFB Hart's failure to label products and documents as "JFB Hart" or "JFB Hart Coatings, Inc." (*Id.* ¶ 61.)

## III. Events Leading to AM General's Motion for Default Judgment

JFB Hart initiated this action for declaratory judgment on December 1, 2009. (R. 1, Compl.) On January 21, 2010, AM General filed a motion to dismiss the case, which the Court granted on January 28, 2010, primarily because JFB Hart had failed to specify the alleged trade secrets involved in this lawsuit. (R. 14, Def.'s Mot. to Dismiss; R. 18, Minute Order Granting Def.'s Mot. to Dismiss.) JFB Hart filed an amended complaint on February 17, 2010. (R. 20, Am. Compl.) AM General filed a new motion to dismiss on April 5, 2010, which the Court denied without prejudice to its potential renewal as a motion for summary judgment. (R. 24, Def.'s Mot. to Dismiss Pl.'s Am. Compl.; R. 29, Minute Order Denying Def.'s Mot. to Dismiss.) On September 2, 2010, JFB Hart filed a motion for leave to file a second amended complaint. (R. 34, Pl.'s Mot. for Leave to File Second Am. Compl.) AM General filed a motion for default judgment and a motion to compel on September 22, 2010. (R. 40, Def.'s Mot. for Default J.; R. 42, Def.'s Mot. to Compel.)

### 1. Exhibit A to JFB Hart's Amended Complaint

Central to this motion is Exhibit A to the amended complaint, which contains formulas and manufacturing methods for the castable urethanes. (R. 20, Am. Compl., Ex. A.) Following the dismissal of its original complaint, JFB Hart produced Exhibit A in response to the Court's suggestion that JFB Hart identify its trade secrets under seal.[2] (R. 46, Pl.'s Mem. in Opp'n to Def.'s Mot. for Default J. ("Pl.'s Mem.") at 1.)

---

[2] According to Jason Beedie, "pages 1-96 of Exhibit A relate to formulas and manufacturing methods for the optically clear (referred to as 'Clear,' 'OCM,' or 'BTA') castable urethane materials. Pages 97-122 of Exhibit A relate to formulas and methods for the opaque (referred to as 'Color,' 'BM Color,' or 'SAM') castable urethane materials." (R. 46, Pl.'s Mem., Ex. 1 ¶ 4.)

What exactly Exhibit A is, how it was portrayed by JFB Hart to the Court and to AM General, and statements made about the production of Exhibit A by JFB Hart executive Jason Beedie ("Beedie") in his deposition are the main disputes at issue in this motion for default judgment. What is not in dispute at this stage is that the documents in Exhibit A are not original documents; they are documents created by Beedie after the initiation of the lawsuit. (R. 46, Pl.'s Mem., Ex. 2, ¶ 8.) At this point, it is largely undisputed that Beedie altered internal, already-existing business record documents, the "source documents," to create the misleading new documents used in Exhibit A. (*Id.*, Ex. 1, ¶ 4.) The source documents consisted primarily of JFB Hart electronic files and copies of handwritten notes made by JFB employees Richard Hart ("Hart") and Aaron Mann ("Mann") that contained formulas and manufacturing methods for the castable urethanes. (*Id.* ¶ 5.) Some of the source documents have headings that reference "AMT," "AMT-Project," or "AMT-Ballistic Project," which refer to Alpha Material. (*Id.* ¶ 6.) When Beedie created the new documents for Exhibit A, he did not maintain those headings. (*Id.* ¶ 8.) Instead, after removing references to Alpha Material, Beedie added JFB Hart's name. (*Id.* ¶ 10.) Beedie maintained the "AMT" heading only for source documents for which he had only image files. (*Id.* ¶ 12.) With the source documents of Hart's handwritten notes, Beedie rewrote the formulas on a common template—one with a JFB Hart heading—and marked the document with the date that the formula had originally been recorded. (*Id.* ¶ 9.) In some cases, he added or changed dates. (*See* Def.'s Reply in Support of Its Mot. to Compel at 5-6.) He did not include any references to Alpha Material that were on Hart's original notes. (R. 46, Pl.'s Mem., Ex. 1, ¶ 16.) Beedie stamped each newly created document with a large, red "Confidential" stamp. (*Id.* ¶ 10.) In some cases, Beedie also added a confidential watermark to the new document. (*Id.* ¶ 29.)

Importantly, all of the significant alterations were never disclosed to AM General's attorneys. Instead, the alterations were only uncovered after significant investigation by AM General's attorneys coupled with the questioning of Beedie at his deposition.

## 2. Beedie's Deposition Testimony

On August 20, 2010, Beedie gave deposition testimony in this case. (R. 40, Def.'s Mem. in Support of Its Mot. for Default J. ("Def.'s Mem."), Ex. 2 at 1.) During the deposition, Beedie claimed that JFB Hart had copies of documents from Exhibit A with both AMT and JFB Hart letterhead. (*Id.* at 214-15.) Beedie also testified that the handwritten lab notes he used to create Exhibit A "had exactly the same thing that's on these [Exhibit A] pages." (*Id.* at 221.) Beedie asserted that he "did not create any new documents" for Exhibit A. (*Id.* at 223.) He also repeatedly testified that he did not recall making any changes or alterations to the documents. (*Id.* at 212-32.)

## 3. Document Production Issues

After JFB Hart submitted Exhibit A with its amended complaint, AM General requested that JFB Hart produce "[a]ll documents relating to any of the formulas, manufacturing methods, and other information in Exhibit A to the Amended Complaint" on May 6, 2010. (*Id.*, Ex. 4.) Despite this request, JFB Hart initially produced the source documents for only 44 of the 122 pages of Exhibit A before depositions began in August 2010. (R. 46, Pl.'s Mem, Ex. 2 ¶ 16.) Hart's handwritten lab notes that Beedie used for Exhibit A were not produced until after Hart's deposition. (*Id.* ¶ 19.) JFB Hart also failed to produce numerous other source documents until after the close of discovery. (*Id.* ¶¶ 26, 28.)

AM General filed a motion to compel on September 22, 2010 seeking an order compelling JFB Hart to produce all versions of the documents contained in Exhibit A and any electronic metadata related to those documents. (R. 42, Def.'s Mot. to Compel at 1.) In its response to the motion to compel, JFB Hart stated that it had turned over all of the source documents for Exhibit A, and would produce the metadata for the source documents. (R. 45, Pl.'s Resp. to Def.'s Mot. to Compel.) On November 1, 2010, JFB Hart filed a notice of production with the Court, stating that it had provided AM General with the information requested in AM General's motion to compel. (R. 49, Pl.'s Notice of Produc.) On November 19, 2010, AM General responded to JFB Hart's notice of production, stating that JFB Hart still had not produced all of the documents and metadata sought in AM General's motion to compel, and suggesting that what had been produced raised questions of possible spoliation and discovery abuse.[3] (R. 50, Def.'s Resp. to Pl.'s Notice of Produc.)

## LEGAL STANDARD

Before a court may impose the sanction of default judgment, the party moving for the sanction must show that the party against whom default judgment is sought "acted with willfulness, bad faith, or fault." *See Maynard v. Nygren*, 332 F.3d 462, 467-68 (7th Cir. 2003). In *Maynard*, the Seventh Circuit held that this showing must be made by clear and convincing evidence. *Id.* More recent Seventh Circuit cases, however, have questioned that standard and indicated that the proper burden for the sanction of dismissal is the preponderance of the evidence. *See Ridge Chrysler Jeep, LLC v. Daimlerchrysler Fin. Serv. Americas LLC*, 516 F.3d

---

[3] AM General claims that several of the native versions of the source documents have last modified dates that post-date the Court's dismissal of JFB Hart's original complaint. (R. 50, Def.'s Resp. to Pl.'s Notice of Produc. at 4.) Because JFB Hart has not had an opportunity to respond to these serious allegations, the Court does not consider them in this opinion.

623, 625-26 (7th Cir. 2008) (noting that while *Maynard* used the "clear and convincing" standard, that case failed to address Supreme Court precedent holding "that heightened burdens of proof do not apply in civil case unless a statute or the Constitution so requires") (citing *Grogan v. Garner*, 498 U.S. 279 (1991); *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)); *see also Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007). In both *Ridge* and *Wade*, despite doubting that the "clear and convincing" standard is the proper one, the Seventh Circuit declined to overrule *Maynard* because the misconduct in both case was established under either burden of proof. *Ridge*, 516 F.3d at 626; *Wade*, 500 F.3d at 564. Because *Maynard* has not been overruled, the Court will grant the motion for default judgment only if AM General demonstrates that JFB Hart "acted with willfulness, bad faith, or fault" by clear and convincing evidence.

## ANALYSIS

A district court may dismiss a case for discovery violations or other egregious conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent authority of the district court. *See Greviskes v. Univ. Research Assoc., Inc.*, 417 F.3d 752, 758-59 (7th Cir. 2005) (citations omitted). Although Rule 37 requires violation of a judicial order before a court imposes sanctions, "[c]ourts can broadly interpret what constitutes an order for purposes of imposing sanctions" and a formal order is not required. *Quela v. Payco-General Amer. Credits, Inc.*, No. 99 C 1904, 2000 WL 656681, at *6 (N.D. Ill. May 18, 2000) (collecting cases). This broad latitude "stems from the presumption that all litigants . . . are reasonably deemed to understand that fabricating evidence and committing perjury is conduct of the sort that 'is

11

absolutely unacceptable.'" *REP MCR Realty, L.L.C., v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005).

Even if Rule 37 did not apply, however, it is well settled that federal courts have inherent powers to sanction litigants for conduct that abuses the judicial process. These powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation omitted). Under these powers, courts can impose sanctions including default judgments and shifting attorney's fees. *See id.* at 44-45. This inherent authority of a court to dismiss a case is not without limitations; rather, it "should be used 'only when there is a record of delay [or] contumacious conduct . . . In deciding what measure of sanctions to impose, the district court should consider the egregiousness of the conduct in question in relation to all aspects of the judicial process.'" *Greviskes*, 417 F.3d at 758-59 (quoting *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003) (internal quotation marks and citation omitted)).

Both parties agree that the "contumacious" conduct required for dismissal of a case with prejudice occurs "where a party has displayed fault, bad faith, or willfulness." *Id.* (citing *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996)). Willfulness and bad faith are associated with conduct that is either "intentional or reckless[.]" *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000). Fault, however, "does not speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation." *Id.* (internal quotation marks and citation omitted). While "fault" requires only gross negligence or "objectively unreasonable behavior," it "is not a catch-all for any minor

blunder that a litigant or his counsel might make" and does not include conduct that can be classified as "a mere mistake or slight error in judgment." *Id.*

AM General claims that JFB Hart's conduct related to Exhibit A merits dismissal of the case because: (1) JFB Hart bases its case on fabricated evidence; (2) JFB Hart's Rule 30(b)(6) witness testified falsely regarding his creation of the fabricated documents; and (3) JFB Hart has not timely produced documents that are central to the case.[4] (R. 40, Def.'s Mem. at 1.)

## I. Exhibit A: Demonstrative Exhibit or Fabricated Documents?

AM General argues as its first ground for dismissal that JFB Hart has "distorted the litigation process and committed fraud on the Court by submitting its Exhibit A without disclosing to the Court that Jason Beedie fabricated Exhibit A[.]" (R. 40, Def.'s Mem. at 8.) A party has commited "fraud on the court" when that party has "set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (collecting cases). AM General analogizes this case to *Aoude*, in which the First Circuit upheld the district court's sanction of dismissal with prejudice where the plaintiff attached a fabricated document to its complaint. *Id.* The court found this to be "a near-classic example" of "fraud on the court." *Id.*

JFB Hart does not dispute that the Court has the power to sanction JFB Hart if it fabricated documents. Instead, JFB Hart maintains that Exhibit A is a demonstrative exhibit

---

[4] AM General also claims that JFB Hart's case is based on false allegations. (*Id.*) The Court does not address this specific claim because the arguments presented in support of the claim either overlap with the arguments addressed by the Court in this opinion or are more appropriately addressed in a separate motion for summary judgment.

produced in good faith in response to the Court's suggestion that JFB Hart identify the trade

secrets under seal. (R. 46, Pl.'s Mem. at 1.) As an explanation for the creation of the new

documents in Exhibit A, JFB Hart claims that JFB Hart's attorney asked Beedie to identify the

formulas and manufacturing methods at issue in this case, and Beedie determined that "the best

and most efficient way" to do that was to take the actions described above that resulted in Exhibit

A. (*Id.* at 4.) For computer-produced documents, this meant undertaking the considerable effort

to locate the source document, remove references to Alpha Material, add JFB Hart's information,

print the documents, stamp the documents "Confidential," and scan the documents. (R. 46, Pl.'s

Mem., Ex. 1 ¶¶ 4-29.) For Hart's notes, this meant Beedie had to recopy all of the notes by hand

onto paper with a JFB Hart heading, print the newly created documents, stamp them

"Confidential," and scan them. (*Id.*) The many steps that went into creating the 122 documents

for Exhibit A substantially call into doubt Beedie's "efficiency" explanation. Instead, all of

these steps reflect multiple efforts to mislead the objective reader. Since these documents were

prepared for litigation, the objective readers potentially included opposing counsel and this

Court. This Court easily concludes from the format of Exhibit A and the alterations made to the

newly created documents that Beedie thought his method of identifying the trade secrets at issue

was the "best" way to enhance his company's case.

Regarding the format of Exhibit A, there is nothing to indicate that the documents were

newly created for the litigation and for demonstrative purposes only. Instead, an objective review

of the documents leads to the erroneous conclusion that they are contemporaneous JFB Hart

business documents. The first reason the documents appear to be already-existing business

documents is because, as JFB Hart admits, they are "all different documents of very different

dates." (*Id.* at 8.) Some documents are handwritten, some are spreadsheets, and the heading varies depending on the document. There is no uniform format as would be expected of an exhibit created for the litigation. Second, although Beedie made several alterations to the documents in Exhibit A, he maintained their original date instead of the date he created the exhibit, and in some cases, he added or changed dates. (*Id.*, Ex. 1 ¶ 4.) An uninformed reviewer of the documents—as the Court and AM General were for several months prior to JFB Hart's disclosure that Exhibit A was "merely a demonstrative exhibit"—would reasonably assume each document was created on the date provided on the document, which would again lead to the inference that the documents were JFB Hart business documents from dates prior to the initiation of this lawsuit. Finally, while the Court is not aware of any rule requiring that a party mark a demonstrative exhibit as such, given the clear opportunity for the documents in Exhibit A to be misinterpreted as JFB Hart business documents, the Court finds the absence of such a marker to be strong circumstantial evidence of intent to mislead and deceive.

A simple misunderstanding—that the documents in Exhibit A were contemporaneous business documents rather than meant for demonstrative purposes—by itself would not cause the Court to find that JFB Hart acted unreasonably or in bad faith. Rather, in light of what JFB Hart would need to prove in order to obtain a declaratory judgment that it owns the purported trade secrets, the specific alterations made to the Exhibit A documents belie Beedie's explanation that Exhibit A was merely the "best and most efficient way" to identify the trade secrets at issue. Under either Illinois or Indiana law—the parties dispute which is the correct choice of law—JFB Hart has the burden of proving that the formulas and manufacturing methods have been "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy[.]" 765

Ill. Comp. Stat. 1065/2(d)(2); Ind. Code § 24-2-3-2. As discussed above, JFB Hart thus alleges that it took reasonable efforts to maintain the confidentiality of the purported secrets including "controlled handling and limited access by only authorized individuals to the OCM, BTA, and SAM formulas and manufacturing methods" and "conspicuously stamping as confidential the written materials of the OCM, BTA, and SAM formulas and methods." (R. 20, Am. Compl. ¶ 19.) Given this law and JFB Hart's allegations, three changes Beedie made to the source documents to create the Exhibit A documents lead to the conclusion that the confusion Exhibit A created was not a coincidence, "mere mistake or slight error in judgment." *Long*, 213 F.3d at 986.

First, the most important change Beedie made was the removal of any references to Alpha Material or Brown whenever possible.[5] (R. 46, Pl.'s Mem., Ex. 1 ¶¶ 6-7.) Beedie claims that he did so because JFB Hart no longer planned to work with Alpha Material at the time that he was putting together Exhibit A, and thus any reference to Alpha Material was "irrelevant" to his purpose in making the exhibit. (*Id.*) While the Court does not doubt that JFB Hart had abandoned any plans to work with Alpha Material by the time it initiated this lawsuit, it is highly unlikely, if not implausible, that Beedie failed to consider that submitting numerous documents with JFB Hart's purported trade secrets on AMT letterhead—with no mention of JFB Hart—would damage JFB Hart's case.[6] The AMT headings may have been "irrelevant" to the

---

[5] Of the 122 pages of Exhibit A, only three documents had headings that maintained references to AMT because they were image documents that Beedie could not alter. (R. 46, Pl.'s Mem., Ex. 1 ¶ 12.)

[6] Additionally, in his declaration, Beedie recognizes that the letterhead could have legal significance. He notes that some of Hart's notes were written on $H_2O$ Polymers letterhead. (R. 46, Pl.'s Mem., Ex. 1 ¶ 17.) He says that because $H_2O$ Polymers is a wholly-owned subsidiary of JFB Hart, the "$H_2O$ Polymers heading on some of Mr. Hart's notes has no significance with respect to the trade secret information or ownership." (*Id.*)

narrow purpose of identifying the trade secrets in Exhibit A, but are highly relevant to JFB Hart's case as a whole.

The second suspicious change Beedie made to the source documents when he reproduced them for Exhibit A was the replacement of "AMT, Inc." with "JFB Hart, Inc." This placement of "JFB Hart, Inc." at the top of each page implied that the formula or manufacturing method on the page was produced by and belonged to JFB Hart, not Alpha Material, as the source document would imply. Like the removal of the references to Alpha Material on the documents, this alteration leads the Court to believe that Beedie likely viewed the creation of Exhibit A as an opportunity to bolster, or at least prevent harm, to JFB Hart's case.

In his defense, Beedie says that he was only following the oral instructions of JFB Hart's attorney to include JFB Hart's name on each page of Exhibit A. (*Id.* ¶ 3.) JFB Hart claims that because of its small size, it has tried to do as much work in-house as possible to reduce litigation costs, which resulted in Beedie compiling Exhibit A. (*Id.* at 3.) Even assuming that JFB Hart's attorney directed Beedie to include JFB Hart's name on the documents, the way Beedie did it exceeded those instructions in suspicious and misleading ways. For example, one source document had a heading containing "AMT, Inc.," AMT's address, phone and fax numbers, and "Dr. Bill Brown." (R. 40, Def.'s Mem., Ex. 27 at 59.) Instead of merely adding JFB Hart's name to the document, Beedie removed the AMT information and Brown's name and added "JFB Hart, Inc.," JFB Hart's address, and phone and fax numbers, all in the same format as the source document. (R. 20, Am. Compl, Ex. A at 51.) Had Beedie merely been following JFB Hart's attorney's instructions, he need not have removed all information related to Alpha Material and Brown, added the superfluous JFB Hart contact information, or used the font and

formatting of the original document. Those additional actions are indicative of a motive other than merely identifying JFB Hart's purported trade secrets.

The final troubling change Beedie made to the documents produced for Exhibit A is the addition of a red "Confidential" stamp to each document and the addition of a "Confidential" watermark to some documents. Again, in light of the fact that whether JFB Hart took reasonable steps to maintain the secrecy of the purported trade secrets is central to its case, this alteration raises many red flags. While the Court recognizes that JFB Hart would want to maintain the confidentiality of its documents during this litigation, both the way in which Beedie stamped the documents—by hand, with a generic stamp, and with no indication that the stamp was related to litigation—and the redundancy of the stamp—JFB Hart's attorneys also marked the documents confidential—lead this Court to conclude that Beedie's purpose was to mislead.

JFB Hart again claims that Beedie stamped "Confidential" on the documents under the direction of JFB Hart's attorney as part of the in-house work completed by JFB Hart to save on litigation costs. (R. 46, Pl.'s Mem. at 3.) The plausibility of this explanation is called into doubt, however, by the fact that JFB Hart's attorneys placed a Bates stamp—in addition to the stamp added by Beedie—indicating that the documents belonged to JFB Hart and were "Highly Confidential" and meant for "Attorneys' Eyes Only." The Court doubts that duplicative labor ever reduces litigation costs.

JFB Hart further argues that the uniform use of the same stamp on documents from different dates clearly indicates that it was meant for the litigation. (*Id.* at 7-8.) The Court disagrees, however, that this conclusion "is clear upon a simple review of Exhibit A" as JFB Hart suggests. (*Id.* at 7.) Instead, an equally plausible conclusion is that JFB Hart had the practice, in

order to maintain the confidentiality of its purported trade secrets, of stamping documents with information related to its formulas and manufacturing methods with a generic, red "Confidential" stamp. This conclusion is especially reasonable when the red "Confidential" stamp applied by Beedie is compared to the uniform use of the Bates stamp on the documents produced by JFB Hart. The Bates stamp is in the same location on each JFB Hart document and indicates its ownership, confidential nature, and litigation purpose. Additionally, JFB Hart presents no explanation for Beedie's addition of a confidential watermark to only some of the documents in addition to red the "Confidential" stamp.

The nail in the coffin of JFB Hart's excuses for the addition of the "Confidential" stamp to the documents in Exhibit A is its reliance on that very stamp in its amended complaint. Specifically, JFB Hart alleges that one of its reasonable measures to maintain the secrecy of its formulas and manufacturing methods is the "conspicuously stamping as confidential the written materials of the OCM, BTA, and SAM formulas and methods." (R. 20, Am. Compl. ¶ 19.) JFB Hart now argues that "this statement is 100% accurate, and is corroborated by a number of original documents with a confidential marking that have been produced to AMG in connection with this litigation." (R. 46, Pl.'s Mem. at 12.) JFB Hart's careful choice of words does not hide the weakness of this argument. "[A] number of original documents" means 16 of the 122 source documents; the rest of the source documents contain no confidential designation. JFB Hart says the documents have "confidential markings," not confidential stamps, because only three source documents—which contain no mention of JFB Hart—have confidential watermarks that could arguably be considered "stamping." The rest contain statements regarding the confidential nature of the document that are printed on the document.

Given the red "Confidential" stamp placed on all of the documents in Exhibit A, there is no question that JFB Hart's allegation that it took reasonable efforts to maintain the confidentiality of the purported trade secrets by "conspicuously stamping as confidential the written materials of the OCM, BTA, and SAM formulas and methods" is misleading at best. Instead of admitting that the statement may have been misleading given the circumstances, JFB Hart continues to damage its credibility with the Court by arguing that "the statement is 100% accurate." The Court has no choice but to conclude that JFB Hart believes that it is acceptable to submit misleading half truths to the Court, and has done so intentionally.

As its final argument, JFB Hart claims that because Beedie did not alter or change the original source documents or the substantive trade secret information, he did not fabricate any evidence and this case is thus distinguishable from those relied upon by AM General in support of its motion. (*Id.* at 10-11.) This case, JFB Hart claims, is "vastly different" from the cases cited by AM General because the documents in those cases "were unquestionably fabricated to gain an unfair advantage in the litigation." (*Id.*) This argument fails for three reasons. First, as previously discussed, the main dispute in this case is not the details of the formulas and manufacturing methods themselves. Instead, whether JFB Hart owned the purported secrets and kept them confidential are the key issues. Second, the standard of proof for sanctions is "clear and convincing" evidence, not that the documents be "unquestionably fabricated." Contrary to JFB Hart's assertions, JFB Hart need not admit that Exhibit A is a fabricated document for the Court to conclude that it is a fabricated document. Finally, there is no allegation—at least in the current motion for default judgment—that JFB Hart altered the source documents. Instead, AM

General contends that Exhibit A is a fabricated document composed of *new* documents, based on the source documents, with alterations meant to bolster JFB Hart's claims.

Given that whether JFB Hart took reasonable steps to keep its purported trade secrets confidential is central to JFB Hart's case, the specific changes Beedie made to the Exhibit A documents and its resulting format—with no indication of its true nature—cause the Court to conclude that Beedie likely intended to fabricate documents to improve his company's case rather than create a demonstrative exhibit. Such document fabrication is clearly "fraud on the court." *Aoude*, 892 F.2d at 1118. This conclusion is further substantiated by JFB Hart's frequently revised story regarding Exhibit A and Beedie's deposition testimony, to which the Court now turns.

## II.     JFB Hart's Statements Regarding Exhibit A: Truthful, Misleading, or Perjury?

As its second ground for default judgment, AM General argues that JFB Hart has not been forthcoming regarding the true nature of Exhibit A and provided false deposition testimony by Beedie, who is JFB Hart's executive vice president. (R. 40. Def.'s Mem. at 11.) This allegation of perjury, if true, "strikes at the heart of the judicial system. Lying cannot be condoned in any formal proceeding," including a deposition. *Quela*, 2000 WL 656681, at *7 (citing *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323 (1994)). JFB Hart denies that Beedie testified falsely at his deposition and argues that AM General is merely "arguing over semantics." (R. 46, Pl.'s Mem. at 9.) JFB Hart claims that its witnesses and counsel repeatedly explained that Exhibit A was merely a demonstrative exhibit. (*Id.* at 6.)

At Beedie's deposition on August 20, 2010, AM General questioned Beedie for the first time about the documents in Exhibit A. (R. 40, Def.'s Mem., Ex. 2.) Still without the

knowledge that Beedie created the Exhibit A documents for this litigation, AM General questioned Beedie about how the documents in Exhibit A were stored at JFB Hart. (*Id.*) In response to this line of questioning, Beedie explained JFB Hart's computer storage system. (*Id.*) While the Court would like to believe that this failure to correct AM General's confusion regarding Exhibit A was the result of Beedie's misunderstanding of the question, he continued to provide evasive, misleading, and false answers to the questions regarding Exhibit A. AM General specifically points to three sets of questions and answers that demonstrate Beedie testified falsely during his deposition.

The first allegedly false statement came when AM General presented Beedie with the source documents for the first 13 pages of Exhibit A that contain a formula on "AMT, Inc." letterhead, with no mention of JFB Hart. (*Id.* at 212-215.) AM General questioned Beedie about the JFB Hart title on similar documents in Exhibit A, and Beedie testified, "[W]hen we private labeled the product for Brown, we put AMT on it. When [sic] we also had a copy that has JFB's name because JFB is the inventor and manufacturer." (*Id.* at 214-15.) AM General argues that this statement is false because "[w]e now know that the only version that had JFB Hart's name on it is the one Beedie created when he prepared Exhibit A." (R. 48, Def.'s Reply at 8.)

Second, AM General contends that Beedie testified falsely about the handwritten formulas in Exhibit A and their corresponding source documents. When asked about the handwritten documents, Beedie admitted that it was his handwriting and that he had based the documents on lab notes from Mann and Hart, JFB Hart employees. (R. 40, Def.'s Mem., Ex. 2 at 221.) Because AM General had still not received the source documents for the lab notes, AM General asked Beedie, "What do [the original lab notes] look like?" (*Id.*) Beedie answered that

22

the lab notes "had exactly the same thing that's on these [Exhibit A] pages." (*Id.*) AM General claims that a simple comparison of Beedie's versions to the source documents, with the differences described above, shows that this testimony was false. (R. 40, Def.'s Mem. at 11.) JFB Hart maintains that Beedie was referring to the formulas on the documents, which are identical on both versions of the documents. (R. 46, Pl.'s Mem. at 9.) Given the line of questioning before and after Beedie gave this answer, the Court rejects JFB Hart's attempt to explain away Beedie's testimony. Immediately prior to the questions regarding the lab notes, AM General had asked questions about the different letterheads on the documents, the addition of the red "Confidential" stamp to the Exhibit A documents, the addition of the "Confidential" watermark to certain documents, and the dates on the documents. (R. 40, Def.'s Mem., Ex. 2 at 215-221.) There is no mention of the specific formulas or manufacturing methods. (*Id.*) Indeed, AM General was asking what the documents *looked like*, not if the formulas were the same.

The third allegedly false answer provided by Beedie at his deposition occurred when AM General question him about the computer-generated documents. AM General asked, "[W]hen you created Exhibit A, did you go into the computer and print out, you know, and create the documents for purposes of creating Exhibit A?" (*Id.* at 222.) After asking for clarification, Beedie answered, "I did not—I did not create any new documents. My recollection [sic] I didn't create any new documents like this, Page 23. What I recall doing was going into the files and going into the saved formulas, opening those saved formulas and printing those formulas out." (*Id.* at 223.) When asked questions about making, "changes," "deletions," "additions," or

"alterations" to specific documents in Exhibit A, he repeatedly testified that he could not recall doing so. (*Id.* 212-32.)

AM General argues that Beedie's testimony that he "did not create any new documents" for Exhibit A was false given all of the documents he produced for Exhibit A. (R. 40, Def.'s Mem. at 4.) In its defense, JFB Hart claims that Beedie's statement that he "did not create any new documents" for Exhibit A "is not false, but rather relates to the fact that, just as Beedie did not alter or modify any of the original JFB business records, Beedie also did not create any new JFB records." (R. 46, Pl.'s Mem. at 9.) In trying to argue that this statement is "not false," JFB Hart has once again accomplished nothing but further diminishing its credibility with the Court. The statement is clearly false. Beedie was asked if he "create[d] documents for the purpose of creating Exhibit A"—not if he created new business records—and Beedie said he "did not create any new documents." (R. 40, Def.'s Mem., Ex. 2 at 222-23.)

Regarding Beedie's failure to recall the changes he made to the documents, AM General points to the numerous alterations made by Beedie for the Exhibit A documents—the omitting of references to Brown or AMT, the addition of JFB Hart headings, the stamping of pages "confidential," and the addition of "confidential" watermarks—as evidence that Beedie's memory lapse was unreasonable. (R. 40, Def.'s Mem. at 4.) JFB Hart continues to dig the hole it has placed itself in by trying to explain away Beedie's failure to recall any of the changes he made to the documents. (R. 46, Pl.'s Mem. at 9.) It is insulting to the Court to claim that Beedie could not remember any of the alterations he made to nearly 122 documents, except for possibly removing some price information, because nearly seven months had passed between the time he created Exhibit A and his deposition and he did not have the specific documents in front

of him. (R. 46, Def.'s Mem. at 9.) As its final explanation for Beedie's memory failure, JFB

Hart again claims that Beedie's "overriding concern" was to emphasize that he had made no

changes to the substantive trade secrets. (*Id.* at 9.) That excuse is once again implausible given

the context of the answer. All of the questioning preceding Beedie's answers was focused on the

changes to the documents, not the formulas themselves, and there was no accusation that the

formulas had been altered in any way.

JFB Hart's counsel, Gregory Vogler ("Vogler"), has further compounded the problem in

his explanations of Exhibit A. During Mann's deposition on August 27, 2010, in response to an

assertion by AM General's counsel that Exhibit A was a "concocted document," Vogler stated,

"Exhibit A are the trade secrets we've identified for this case, plain and simple. It was prepared

specifically for the case. They do not reflect documents in the course of ordinary business *as to*

*some of them*." (*Id.*, Ex. 5 at 185.) On September 2, 2010, in response to a letter from AM

General, Vogler wrote:

> Your characterizations of JFB Hart's document production is way off base. For
> example, as to the preparation of Exhibit A, *that compilation of information* was
> specially prepared for the lawsuit to identify the trade secrets at issue. *There is no*
> *altering or changing of documents*. JFB Hart prepared *some* new documents (those
> having Jason Beedie's handwriting) specially for the lawsuit to put in Exhibit A. JFB
> Hart had the right to do so and could label them or prepare them however JFB Hart
> desires. Thus, *some* of those documents would not be normal business records of
> JFB Hart kept in the normal course of business.

(*Id.*, Ex. 6.) In the same email, Vogler stated that he was "not aware of any electronic files since

what Jason Beedie newly developed would have been handwritten." (*Id.*) AM General argues

that this explanation indicated that only the handwritten documents in Exhibit A were newly

created, and thus suggested that the electronic documents were unaltered pre-existing business

records when in fact Beedie had made alterations to every electronic document that he could. (R.

48, Def.'s Reply at 8.) Vogler claims that his statement was intended to convey that the underlying source documents were not altered, and to rebut AMT's allegations that Beedie had fabricated evidence. (R. 48, Pl.'s Mem., Ex. 3 ¶ 23.) He admits that he "could have been more precise in [his] quick email response," but denies that he intended to be deceitful in any way. (*Id.* ¶ 24.)

The Court agrees with AM General that the statements of JFB Hart's counsel were misleading and perpetuated the confusion regarding Exhibit A.[7] JFB Hart's frequently revised story regarding Exhibit A as evidenced by Beedie's misleading—and in some cases false—deposition testimony and the representations by JFB Hart's attorney again lead the Court to the conclusion that JFB Hart's conduct was in bad faith.

## III. Document Production Delay: Intentional or Inadvertent?

AM General argues that dismissal is also appropriate because JFB Hart has abused the discovery process by failing to produce all versions of the Exhibit A documents before the depositions or even at the time of the filing of this motion. (R. 40, Def.'s Mem. at 12.) AM General claims that despite earlier document production requests, it was only after Beedie testified that he had created the handwritten pages in Exhibit A, and AM General asked JFB Hart to specifically produce those original handwritten notes by Hart and Mann, that those notes were turned over—a day after Hart's deposition and over a week after they were specifically requested. (*Id.* at 4-5.)

JFB Hart admits that some of the source documents were inadvertently not produced until after Hart's deposition, but that the documents were produced as soon as the omission was

---

[7] The Court does not know whether the misleading statements made by Vogel were intentional or the result of his client's failure to be forthcoming about the documents in Exhibit A.

discovered and that such an omission is not a basis for the drastic remedy of default judgment. (R. 46, Pl.'s Mem. at 1-2, 5-6.) JFB Hart claims that a misunderstanding among JFB Hart's employees and attorneys regarding which documents had already been produced resulted in the initial delay in getting Hart's handwritten notes to AM General. (*Id.*, Ex. 2, ¶ 20.) Beedie and another JFB Hart employee, Tim Kingsbury ("Kingsbury"), claim in their declarations that each assumed the other had sent the original lab notes to JFB Hart's counsel. (*Id.*, Ex. 1 ¶ 18; Ex. 3 ¶¶ 2-5.) JFB Hart maintains that all source documents used in the creation of Exhibit A have now been produced to AM General. (*Id.* at 7; Ex. 1, ¶ 13; Ex. 2, ¶¶ 10, 28.) JFB Hart has also offered to make JFB Hart witnesses available for depositions for questioning on any documents produced after depositions were taken. (*Id.*, Ex. 2, ¶ 29.)

Crediting the affidavits of Beedie, Kingsbury, and Vogler, and in the absence of any evidence showing that the delayed production of the documents was intentional, the Court finds that the delayed production of the Hart notes alone is insufficient to justify the sanction of default judgment. However, the delay provides further support to AM General's other allegations of JFB Hart's bad faith conduct related to Exhibit A.

## IV.    Evidentiary Hearing

Based on the combination of evidence discussed above, the Court finds that it is more likely than not that JFB Hart's conduct in creating and using Exhibit A to the amended complaint has been in bad faith and necessitates sanctions. The specific changes Beedie made to the source documents to create the exhibit, the form of the exhibit as attached to the amended complaint, the evasive, misleading, and sometimes false statements made by JFB Hart regarding Exhibit A, and the delayed production of key source documents all lead to the conclusion that JFB Hart

disregarded its legal and ethical obligations to the Court. While each individual piece of evidence of misconduct may not have the persuasive force to merit default judgment, the Court cannot ignore the force of the combined evidence. Sanctions are appropriate for JFB Hart's conduct; the only question that remains is whether the remedy should be a dismissal of the lawsuit.

Despite the strong weight of the evidence of JFB Hart's misconduct, the Court is conscious that the *Maynard* clear and convincing evidence standard, while called into doubt, has not been overruled, and that of all possible sanctions available to this Court, "dismissal is considered 'draconian.'" *Maynard*, 332 F.3d at 467 (citation omitted). Out of an abundance of caution, this Court will apply the clear and convincing standard in evaluating whether this lawsuit must be dismissed. Application of this higher standard necessitates holding an evidentiary hearing to make any required determinations. In fact, nearly all of the cases relied upon by AM General in support of its motion were dismissed only after the court held an evidentiary hearing. *See Greviskes*, 417 F.3d at 753; *Maynard*, 332 F.3d at 466; *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 221 (7th Cir. 1992); *Quela*, 2000 WL 656681, at *1. Thus, the Court finds that an evidentiary hearing is required in this case before finalizing its ruling on AM General's motion for default judgment. At the hearing, the Court will focus on all the circumstances surrounding the creation and use of Exhibit A. Attorneys for JFB Hart are hereby advised that if this Court concludes that a perjury offense has occurred, this Court will seek a proper criminal investigation. *See Quela*, 2000 WL 656681, at *9.

## CONCLUSION

For the foregoing reasons, AM General's motion for default judgment (R. 40) is stayed

pending an evidentiary hearing, which will proceed on March 10, 2011. AM General's motion to

compel (R. 42) is granted to the extent it is not moot. JFB Hart is ordered to produce all hard

copy and electronic versions of the documents contained in Exhibit A to the amended complaint,

including any metadata, on or before February 22, 2011.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated:** February 8, 2011